Paul Sala, State Bar #11693
Ryan M. Hicks, State Bar #26016
**ALLEN, SALA & BAYNE, PLC**
1850 N. Central Ave., Suite 1150
Phoenix, Arizona 85004
Ofc: (602) 256-6000
Fax: (602) 252-4712
Email: psala@asbazlaw.com
       rhicks@asbazlaw.com

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>SHIVA INVESTMENTS, LLP.,<br><br>Debtor. | CHAPTER 11<br><br>Case No. 2-12-bk-18263-RJH<br><br>**DECLARATION OF ASVINKUMAR L. PATEL IN SUPPORT OF DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION DATED DECEMBER 17, 2012** |

ASVINKUMAR L. PATEL, being first duly sworn upon his oath, declares under penalty of perjury:

1. I am an adult older than 21 years of age.

2. I make this declaration based upon my own personal, firsthand knowledge.

3. I am the managing general partner of Shiva Investments, LLP ("Shiva" or "Debtor").

4. Shiva currently owns Ganeshwar Investment Group, LLC ("Ganeshwar"), and through this related entity, currently operates the motel property located at 1550 N. 52nd Drive, Phoenix, Arizona 85043 (the "Motel Property").

5. I am also a member and the manager of Ganeshwar.

6. I am the person responsible for managing and operating the Motel Property.

7. I submit this Declaration in support of confirmation of the *Debtor's First Amended Plan of Reorganization Dated December 17, 2012* ("Plan").

///

## I. Bankruptcy Proceedings

8. The Debtor owns the Motel Property.

9. The Motel Property consists of a 56-room limited-service motel currently being operated as an America's Best Value Inn franchise.

10. Debtor was formed in 1995 to own, operate and manage the Motel Property.

11. On December 31, 2001, Tarla Patel and I acquired all of the partnership interests in Shiva.

12. From at least December 31, 2001 until June 2008, Shiva operated the Motel Property as a Days Inn franchisee.

13. In September 2007, Shiva refinanced the Motel Property with a $1.4 million dollar loan from BMC Capital; the current holder of which is SH Holdings, LLC ("SH Holdings").

14. The loan was secured by a Deed of Trust and Assignment of Rents as well as a UCC-1 financing statement ("Security Agreements").

15. In June 2008, Shiva's Days Inn franchise was terminated and, hoping to restructure the Motel Property, Tarla and I formed Ganeshwar.

16. In June 2008, Ganeshwar took over motel operations and rebranded the motel as an America's Best Value Inn.

17. The Motel Property continues to be operated as an America's Best Value Inn.

18. In the summer of 2012, SH Holdings initiated a Trustee's Sale of the Motel Property and filed an action in the Maricopa County Superior Court ("Superior Court Litigation") seeking the appointment of a receiver over the Motel Property. A true and correct copy of the Superior Court Litigation *Complaint* is identified as Debtor's Exhibit #19.

19. The Superior Court Litigation also seeks to recover funds from Tarla and me pursuant to our commercial guarantees. A true and correct copy of the Commercial Guaranty is identified as Debtor's Exhibit #21.

20. My wife Tarla and I do have personal assets, although illiquid, which are at risk should SH Holdings prevail in the Superior Court Litigation.

21. To stop the sale of the Motel Property, and to reorganize its debts, Tarla and I caused Shiva to file for Chapter 11 bankruptcy protection on August 15, 2012.

22. During the warm months, Shiva has been unable to offer six of its rooms for rent due to broken air conditioning units.

23. On August 14, 2012, Shiva purchased six air conditioning units with funding provided by Ilesh Bhagat.

24. Shiva executed a promissory note in favor of Mr. Bhagat in the amount of $3,933.45. The promissory note and security agreement are identified as Debtor's Exhibit #16.

25. On August 15, 2012, Mr. Bhagat caused a UCC financing statement to be filed in the office of the Arizona Secretary of State to prefect the lien that Shiva provided. A true and correct copy of the UCC financing statement is identified as Debtor's Exhibit #16.

26. Although Mr. Bhagat is a friend, he is not related to Tarla Patel or me, nor is he a business partner.

27. On August 14, 2012, Shiva borrowed $40,000.00 from Sureschandra Patel to fund a bankruptcy retainer for Allen, Sala & Bayne PLC.

28. The $40,000.00 loan was memorialized in a promissory note and security agreement. A true and correct copy of the promissory note and security agreement is identified as Debtor's Exhibit #17.

29. On August 15, 2012, Sureshchandra Patel caused a UCC financing statement to be filed in the office of the Arizona Secretary of State. A true and correct copy of the UCC financing statement is identified as Debtor's Exhibit #17.

30. Sureshchandra Patel is a friend of mine. He is not a relative of Tarla or me, nor is he a business partner.

31. On August 20, 2012, SH Holdings filed its Motion for Relief from the Automatic Stay ("Motion for Relief") asserting that the Motel Property was worth $900,000.00.

32. On September 12, 2012, Maricopa County filed its Proof of Claim indicating Shiva owed it $101,462.74 in real property taxes.

33. The current amount owed to Maricopa County for real property taxes through tax

Case 2:12-bk-18263-RJH  Doc 148  Filed 03/22/13  Entered 03/22/13 14:52:06  Desc
Main Document    Page 3 of 10

year 2012 is $106,317.47. True and correct copies of the tax summary reports, as they appear on the county website, are identified as Debtor's Exhibit #18.

34. Real estate taxes continue to accrue for 2013 at the rate of approximately $66,000.00 per year.

35. Shiva's Plan of Reorganization was filed on November 15, 2012.

36. SH Holdings filed is Proof of Claim on November 30, 2012 indicating that Shiva owes $2,113,101.00. A true and correct copy of the Proof of Claim is identified as Debtor's Exhibit #20.

37. SH Holdings is the first priority lienholder against the Motel Property behind only Maricopa County claim real property taxes.

38. Shiva's First Amended Plan of Reorganization ("Amended Plan") was filed on December 17, 2012. A true and correct copy of the Amended Plan is identified as Debtor's Exhibit #4.

39. On December 19, 2012, Days Inn Worldwide ("DIW") filed a Proof of Claim indicating Shiva owes it $166,907.28.

40. Shiva and DIW filed a Settlement Agreement regarding the value, classification and treatment of the DIW claim on March 22, 2013. A true and correct copy of the Settlement Agreement is identified as Debtor's Exhibit #25.

41. The First Amended Disclosure Statement and the First Amended Plan indicated Shiva's intent to cramdown SH Holdings' claim to the current market value of the Motel Property and treat the balance remaining as an unsecured claim.

42. The First Amended Plan provides payments of $45,000.00 per year for five years to Maricopa County and the Priority and General Unsecured Creditors.

43. On January 7, 2013 the Court approved the First Amended Disclosure Statement.

44. SH Holdings has not taken its Section 1111(b) election.

45. SH Holdings submitted two ballots rejecting the First Amended Plan in Classes III(b) and IV(a).

46. On February 8, 2013 Shiva filed its Ballot Report reflecting all ballots cast as of

February 7, 2013. A true and correct copy of the Ballot Report is identified as Debtor's Exhibit #24.

47. As set forth in the Ballot Report, Classes III(c), III(d) and V voted to accept the Amended Plan and Classes III(b) and IV(a) voted to reject the Amended Plan.

48. During this case, Marie Laatsch of Axia Appraisals was employed to prepare an appraisal report of the Motel Property.

49. Mrs. Laatsch appraised the Motel Property on or about January 27, 2013 and valued the property at $1,100,000. A true and correct copy of this appraisal is identified as Debtor's Exhibit #7.

50. During this case, Navin Kuber was employed to provide management and rebranding consulting services to the Debtor.

51. Mr. Kuber's primary responsibilities have included spearheading the Econolodge rebranding efforts.

## II. The Amended Plan of Reorganization

52. To the best of my knowledge, after considering professional advice, the Amended Plan complies with the provisions of the United States Bankruptcy Code ("Code"), the Debtor, as proponent of the Amended Plan, also comply with the applicable provisions of the Code as required by 11 U.S.C. §1129(a)(1) and (2).

53. The Amended Plan has been negotiated and proposed in good faith and not by any means forbidden by law as required by Section 1129(a)(3).

54. All payments to be made pursuant to the Amended Plan, by the Debtor, or any person issuing securities (if applicable), has been approved by this Court as reasonable, as required by Section 1129(a)(4).

55. The identity and affiliations of any individual proposed to serve as a director, officer, operator, or as voting trustee, of the Debtor, has been disclosed as required by Section 1129(a)(5)(A)(i).

56. No rate changes need to be approved by any government regulatory commission; thus Section 1129(a)(6) is inapplicable.

57. Each class of impaired claims has either accepted the Amended Plan or will receive or retain on the Effective Date a value not less than what they would otherwise receive in a Chapter 7 liquidation scenario as required by Section 1129(a)(7)(A).

58. Section 1129(a)(7)(B) is not applicable in this case because no secured creditors elected to have their claims treated under Section 1111(b)(2) of the Code.

59. All administrative expense claims will be paid in full in cash on the Effective Date of the Plan as required by Section 1129(a)(9)(A), unless they have agreed to alternative treatment.

60. There are no domestic support claims, wage claims, employee benefit plan claims, farmers and fishermen's claims, not lease deposit claims in this case. Accordingly, Section 1129(a)(9)(B) is not applicable to this case.

61. All unsecured tax claims will receive the value of their claims as of the Effective Date no later than November 15, 2017 which is five years from the Petition Date, in a manner at least as favorable as the most favored non-priority unsecured claims.

62. Secured tax claims will receive the same treatment as unsecured priority tax claims as required by Section 1129(a)(9)(D).

63. Two impaired consenting classes have accepted the Amended Plan (not including any insiders) as required by Section 1129(a)(10).

64. In light of the New Value my wife and I are contributing, and the rebranding of the Motel Property, I believe that confirmation of the Amended Plan is not likely to be followed by liquidation or subsequent need to reorganize.

65. Any and all bankruptcy fees as described in 28 U.S.C. §1930 have been paid, or will be paid in full on the Effective Date.

66. Section 1129(a)(13) is not applicable in this case as no retiree benefits are owed by the Debtor.

67. Sections 1129(a)(14) and (15) are not applicable in this case.

68. Any and all transfers under the Amended Plan shall be made in accordance with any applicable provisions of non-bankruptcy law.

69. As required by Section 1129(b)(1), the Amended Plan meets all requirements of section 1129(a), except subsection (a)(8), does not discriminate unfairly, and is fair and equitable with respect to each impaired class that has not accepted the Amended Plan.

70. Each of the secured claimants shall retain their liens and receive on account of their claims deferred cash totaling at least the allowed amount of the claim of a value as of the Effective Date of at least the value of the claim holder's interest in property of the estate as required by Section 1129(b)(2)(A)(i).

71. Because unsecured claimants will not be paid in full, the Amended Plan eliminates all of the Debtor's existing equity interests.

72. Debtor's ability to fund its obligations under the Amended Plan, including administrative expenses, costs of rebranding and post-petition real property taxes, is dependent upon the $163,500 new value cash infusion provided by Debtor's principals.

### III. New Value Cash Infusion

73. Tarla and I have borrowed $163,500.00 from friends and family to provide as a cash infusion to the Debtor upon confirmation of the Amended Plan ("New Value Funds").

74. The full $163,500.00 is currently being held in ASB's IOLTA Trust Account and will be released to the Debtor upon confirmation.

75. In the unlikely event the Amended Plan is denied confirmation, the New Value funds shall be used to satisfy ASB's allowed attorney's fees with the remaining balance is to be returned to us.

76. Once the Amended Plan is confirmed, the New Value Funds will be used for the following:

    a. To satisfy any and all administrative expenses on the Effective Date. I estimate this amount to be approximately $55,000.00;

    b. To provide funds necessary to complete the required items found in the Choice Hotels Property Improvement Plan which I estimate to be approximately $30,000 to $35,000;

    c. To satisfy all real property taxes incurred post-petition which I estimate to be

|   |   |
|---|---|
| 1 | approximately $27,000.00; and |
| 2 | d. To be used to capitalize the Debtor to ensure operations continue uninterrupted during the historically slow summer season. |

77. Absent the New Value Funds, Debtor does not have the ability to fund the Amended Plan and cannot obtain financing elsewhere.

78. Tarla Patel and I will receive the equity ownership interests in the reorganized Debtor in exchange for our new value contribution; all existing membership interests in the Shiva shall be extinguished on the Effective Date.

79. Currently Debtor has secured debt far in excess of the appraised value of the Motel Property.

80. The value of the equity ownership interests to be received by Tarla Patel and I are reasonably equivalent to, or less than, the $163,500.00 cash infusion.

### IV. Choice Hotels/Econolodge

81. Debtor is in the process of rebranding the Motel Property from the current America's Best Value Inn franchise to an EconoLodge franchise.

82. Choice Hotels International (parent company of EconoLodge) has approved Debtor and the Motel Property as a new EconoLodge franchisee and is currently in the process of executing the documents required to memorialize this approval.

83. Upon confirmation of the Amended Plan, Shiva will pay all required franchise affiliation fees to Choice Hotels International and complete the required property improvements so the Debtor may begin operations as an Econolodge; a process that I think will take no more than 60 days.

84. Choice Hotels will require Debtor to pay the affiliation fee of $15,000, resurface the parking lot, provide amenities with the Econolodge logo, install an Econolodge sign, and purchase and install the hardware necessary to support the Choice Hotels property management system.

85. My understanding is that not all of the items provided in the Econolodge Property Improvement Plan are required to be completed prior to operating the Motel Property

as an Econolodge.

86. The costs associated with the required items listed above should be approximately $30,000 to $35,000, which will be paid from the New Value Funds.

V. **Management and Motel Operations**

87. Prior to filing this case, the Motel Property was being managed and operated by Tarla and me. Shiva also employs a part-time housekeeper to help clean the rooms and an additional front desk clerk during the busy season.

88. After meeting with Navin Kuber and Vishal Bhakta, I became aware of certain things Debtor must to do to increase revenues.

89. First, Debtor intends to retain Mr. Bhakta on a temporary basis to help implement the Econolodge procedures and policies and further train the Debtor's principals on how to effectively and efficiently manage and operate the Motel Property.

90. Mr. Bhakta recently rebranded his Woodland Inn motel in Pinetop, Arizona to an Econolodge.

91. Mr. Bhakta will teach me how to (a) create, operate and optimize a website dedicated to the Debtor and the Motel Property; (b) increase the Motel Property's market exposure by linking with other third party reservation systems such as Hotels.com and Travelocity; (c) implement and install the Choice Hotels property management system; (d) train me to effectively market the Motel Property to tourists and corporate clients alike by developing promotional programs tailored to each target market; (e) obtain, review and analyze local market trend reports to ensure the Motel Property is properly positioned in the market regarding room rates and expenses; (f) transfer the current hand-written book keeping system into electronic format; and (g) record book and record keeping electronically moving forward.

92. Mr. Bhakta's training and assistance will allow Tarla and I to seamlessly integrate Econolodge's systems, policies, and procedures while providing us with the knowledge required to better operate and market the Motel Property.

93. With the knowledge and information to be provided by Mr. Bhakta, Debtor will be able to meet, or exceed, the average daily rates and occupancy levels of its local competition.

94. By meeting or exceeding these numbers, Debtor will be able to meet the income projections provided as an exhibit to the Amended Disclosure Statement.

95. I am confident the Debtor, with Econolodge and Mr. Bhakta's assistance, will be able to meet the income projections attached to Debtor's Amended Disclosure Statement.

96. Accordingly, Debtor will be able to meet its obligations under the Amended Plan as confirmed.

DATED this 22nd day of March, 2013.

/s/ *(signature)*
Asvinkumar L. Patel

SUBSCRIBED AND SWORN TO BEFORE ME this 22nd day of March, 2013, by Asvinkumar L. Patel.

/s/ *(signature)*
Notary Public

My Commission Expires:
06/02/2016

EDUARDO OAXACA
NOTARY PUBLIC - ARIZONA
Maricopa County
My Commission Expires
June 2, 2016

COPY of the foregoing emailed
on March 22, 2013 to:

Harold E. Campbell
John D. Yohe
1811 S Alma School Dr., Suite 225
Mesa, Arizona 85210
heciii@haroldcampbell.com
john@haroldcampbell.com
*Attorneys for SH Holdings, LLC*

/s/ *Misty Hinshaw*

-10-
C:\Users\Guest\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.IE5\XXZP85WT\Declaration of Ash Patel.

Case 2:12-bk-18263-RJH    Doc 148    Filed 03/22/13    Entered 03/22/13 14:52:06    Desc
Main Document    Page 10 of 10